```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

 3

 4   United States of America,

 5                        Plaintiff,

 6   vs.                        Criminal Action No. 3:21-cr-49-2

 7   Diana Toebbe,

 8                        Defendant.

 9

10

11          Excerpt of proceedings had in the Detention Hearing

12   in the above-styled action on October 20, 2021, before the

13   Honorable Robert W. Trumble, Magistrate Judge, at Martinsburg,

14   West Virginia.

15

16                        APPEARANCES

17   On behalf of the United States of America:

18          Jessica Lieber Smolar
            Assistant United States Attorney
19          United States Attorney's Office
            700 Grant Street, Ste. 4000
20          Pittsburgh, Pennsylvania  15219

21          S. Derek Shugert
            U.S. Department of Justice
22          950 Pennsylvanie Avenue, NW, Suite 7700
            Washington, DC  20530

23

24   The defendant was present in person.

25   Proceedings reported by means of digital recording; transcript
     produced by official court reporter.
```

```
 1                        APPEARANCES (Continued)

 2

 3   On behalf of the Defendant:

 4            Edward B. MacMahon, Jr., Esq.
             107 East Washington Street
 5           Middleburg, Virginia 20118

 6
             Barry P. Beck, Esq.
 7           Power, Beck & Matzureff Law Office
             308 West Burke Street
 8           Martinsburg, West Virginia  25401

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX TO WITNESSES

 2

 3                                                         PAGE

 4    TESTIMONY OF PETER OLINITS

 5        Direct Examination by Ms. Smolar           5

 6        Cross Examination by Mr. MacMahon          54

 7        Redirect Examination by Ms. Smolar         69

 8        Recross Examination by Mr. MacMahon        72

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          EXHIBIT INDEX

 2

 3    Government

 4    Exhibit No.      Admitted      Description        Page

 5

 6     1                 X           Photograph         16

 7     2                 X           Photograph         17

 8     3                 X           Photograph         19

 9     4                 X           Photograph         20

10     5                 X           Video              22, 31, 42

11     6                 X           Photograph         23

12     7                 X           Photograph         29

13     8                             Photograph         29

14     9                 X           Photograph         33

15    10                 X           Photograph         40

16    11                 X           Photograph         40

17    12                 X           Photograph         41

18    13                 X           Photograph         43

19    14-25              X           Photographs        46

20    26                 X           Excerpt            52

21

22

23

24

25
```

PETER OLINITS – DIRECT EXAMINATION

1          (Digitally-recorded proceedings in open court.)

2                (October 20, 2021, 1:24 P.M.)

3                          – – –

4     (The following is an excerpt from the detention hearing

5     held October 20, 2021.)

6                          – – –

7          MS. SMOLAR:  The government has filed a motion for

8  detention on the basis of risk of flight, risk of

9  nonappearance, as well as obstruction of justice.

10     At this time, the government calls FBI Special Agent Peter

11  Olinits.

12     (The witness was sworn in.)

13          THE WITNESS:  I do.

14          THE CLERK:  You may have a seat, please.

15                    DIRECT EXAMINATION

16  BY MS. SMOLAR:

17  Q.  Can you please state your full name for the record.

18  A.  Peter Olinits.

19  Q.  How do you spell your last name?

20  A.  O-L-I-N-I-T-S.

21  Q.  And where are you currently employed?

22  A.  Employed as a special agent with the FBI from the –– out of

23  the Pittsburgh Division.

24  Q.  How long have you been a special agent with the FBI?

25  A.  Approximately 11 1/2 years.

PETER OLINITS - DIRECT EXAMINATION

1  Q.  And within the Pittsburgh Division of the FBI, where are

2  you assigned?

3  A.  I'm assigned to a counterintelligence division.

4  Q.  Could you explain to us what that means?  What type of

5  cases do you work on?

6  A.  So counterintelligence is basically the FBI's defensive

7  posture against a foreign adversary's offensive efforts to

8  collect national intelligence information.  So espionage cases,

9  for example, are some of the types of cases we work on our

10  squad.

11  Q.  Prior to joining the FBI 11 1/2 years ago, what did you do

12  for employment?

13  A.  I was a biochemist at a pharmaceutical company in

14  Swiftwater, Pennsylvania.

15  Q.  Do you have training and experience in working on espionage

16  cases?

17  A.  Yes.  Over my 11 1/2 years as a special agent in the FBI,

18  I've worked several espionage investigations.

19  Q.  Were you involved in the investigation involving Jonathan

20  and Diana Toebbe?

21  A.  Yes.  I was involved with both of their investigations.

22  Q.  Were you one of the primary case agents on that

23  investigation?

24  A.  Yes.  I was considered a co-case agent.

25  Q.  How old is Diana Toebbe?

PETER OLINITS – DIRECT EXAMINATION

1  A.  She is 45 years old.

2  Q.  Is she employed?

3  A.  She is.  She's employed at the Key School in Annapolis,

4  Maryland.

5  Q.  And do you know anything about the status of her current

6  employment?

7  A.  I believe she's potentially going to be suspended if she's

8  not already.

9  Q.  What's her marital status?

10  A.  She's married to Jonathan Toebbe.  They've been married for

11  18 years.

12  Q.  And what's her educational background?

13  A.  She has a Ph.D. in anthropology.

14  Q.  Where is Mr. Toebbe employed?

15  A.  He is a nuclear engineer for Naval Reactors out of the Navy

16  Yard in Washington D.C.

17  Q.  How long has he been in that position?

18  A.  Since 2012.

19  Q.  And can you explain to us what GS level his position has?

20  A.  He is a GS-15 which is the highest GS level you can get in

21  the government without becoming an SES level which is a senior

22  executive level in the government.  So he's the highest

23  government employee as a GS-15.

24  Q.  And does he hold any special clearances for the government?

25  A.  He holds a top secret clearance as well as a Q clearance.

PETER OLINITS - DIRECT EXAMINATION

1   Q.  Explain to us what a Q clearance is.

2   A.  A Q clearance is basically the Department of Energy's

3   equivalent to a top secret clearance.

4   Q.  Could you explain Mr. Toebbe -- just briefly --

5   Mr. Toebbe's career trajectory within the United States Navy.

6   A.  So in 2012 he became active duty, and he worked in active

7   duty until 2017 where he became a civilian and also was in

8   reserves at that point.

9   Q.  And does he work within a special section of the United

10  States Navy?

11  A.  He works within Naval Reactors.  Naval Reactors is

12  responsible for the design implementation of the Navy's nuclear

13  fleet, specifically the Virginia-class submarines.

14  Q.  How much does a Virginia-class submarine cost to build?

15  A.  Approximately three billion dollars, not including the R&D

16  that goes into it or the maintenance.

17  Q.  And are Virginia-class submarines currently being used by

18  our United States Navy?

19  A.  They are.

20  Q.  And are they expected to be used in the future?

21  A.  I believe until 2060.

22  Q.  What's Mr. Toebbe's educational background?

23  A.  He has a bachelor's degree in physics, a master's degree in

24  physics, and a master's degree in nuclear engineering.

25  Q.  Did your investigation reveal that Jonathan Toebbe had

PETER OLINITS - DIRECT EXAMINATION

1  access to Restricted Data as defined both in the complaint

2  affidavit and in the indictment recently filed in this case?

3  A.  He did.

4  Q.  And was that Restricted Data relating to the Virginia-class

5  submarine?

6  A.  It was.

7  Q.  And did he obtain that information during the course of his

8  employment with the United States Navy to your -- the best of

9  your knowledge?

10  A.  To the best of my knowledge, he did.

11  Q.  Did your investigation also reveal whether Mr. Toebbe was

12  trained on counterintelligence measures?

13  A.  Yes, he was.

14  Q.  Can you tell us what started the FBI's investigation into

15  Diana and Jonathan Toebbe?

16  A.  So in December 2020, the FBI received from a legal attaché

17  named COUNTRY1 a volunteer letter that was addressed to

18  COUNTRY1's military intelligence services.  On the letter, the

19  postmark was dated April 1, 2020, and the return address was a

20  Dr. Alice Hill in Pittsburgh, Pennsylvania.

21  Q.  And did the letter also contain something else in it?

22  A.  So it contained 17 hard copy pages of confidential

23  Restricted Data as defined by the government.  It also

24  contained an SD card which contained an additional

25  electronic -- in an electronic format an additional 76 pages of

PETER OLINITS - DIRECT EXAMINATION

1   confidential Restricted Data related to the Virginia-class

2   submarines.

3   Q.  And to be clear, when we talk about Restricted Data here

4   today, did the FBI provide that data to the Navy to ascertain

5   whether it was, in fact, classified or Restricted Data?

6   A.  Absolutely.  It was provided to a Navy subject matter

7   expert who did confirm that that was authentic and classified

8   information.

9   Q.  And did the pages that you just referred to that were in

10  the letter, did they have a legend on them indicating that they

11  were in some way confidential?

12  A.  Yes.  There was banner markings on them which clearly said

13  "confidential information."

14  Q.  Can you read to us a portion of the text from that letter

15  relevant to today's proceeding?

16  A.  I can.  So the letter that was sent to COUNTRY1, a

17  volunteer letter, dated April 1, 2020:  "I have in my

18  possession several thousand pages of classified documents

19  describing the [REDACTED].  A small random sample of them is

20  included in this envelope to convince you of the truth of my

21  claim.  A 76-page summary of the documents, tables of contents,

22  drawings, schematic lists, et cetera, is loaded on the memory

23  card taped to this letter.  Also on this memory card are the

24  instructions and keys necessary to decrypt the documents using

25  the publicly available GPG software.  Please have your experts

PETER OLINITS - DIRECT EXAMINATION

1   examine the documents.  I think they will agree that your

2   country's effort to develop a [REDACTED] would be greatly

3   aided.  This information is extremely valuable, and I am

4   risking my life to offer it to you.  I expect to be very well

5   paid in cryptocurrency.  Please do not delay in contacting me

6   to agree on a sale price.  If you do not contact me by

7   December 31, 2020, I will conclude you're uninterested and will

8   approach other possible buyers."

9      There was also a second part of that where there was a

10  portion that was translated to COUNTRY1's language, and it was

11  also written in English.  And it says, "I apologize for this

12  poor translation into your language.  Please forward this

13  letter to your military intelligence agency.  I believe this

14  information will be of great value to your nation.  This is not

15  a hoax."

16  Q.  Thank you.  So to be clear, this case began when a letter

17  was actually received by COUNTRY1; correct?

18  A.  Yes.

19  Q.  And then COUNTRY1 provided that letter to the FBI legal

20  attaché; correct?

21  A.  That's correct.

22  Q.  And the letter contains specific instructions for the

23  foreign military intelligence agent to follow?

24  A.  Absolutely.  And it talks about how to encrypt this

25  information.

PETER OLINITS – DIRECT EXAMINATION

1   Q.   And does it refer to something called ProtonMail?

2   A.   Yes, it does.

3   Q.   And what is ProtonMail?

4   A.   ProtonMail is an encrypted email server based out of

5   Switzerland, and it is a very secure way to communicate email

6   messages.

7   Q.   When the FBI received this letter from its legal attaché in

8   COUNTRY1, what then did the FBI do with regard to this

9   investigation?

10  A.   So because obviously we realized that this was real –- the

11  information in there was authenticated by the Navy as

12  classified information –- we had a deadline of December 31,

13  2020, to meet because we were afraid that this was going to be

14  shopped around to other possible buyers.   So on December 26,

15  2020, the FBI commenced an undercover operation to try to

16  identify the sender or senders of this letter.

17  Q.   And were there numerous messages sent back and forth

18  between the sender of the letter and the FBI undercover

19  agents?

20  A.   Yes, via ProtonMail.

21  Q.   And did the FBI pay any money to the sender of the letter?

22  A.   We paid $10,000 as a sign of good faith.

23  Q.   How was that paid?

24  A.   It was paid in cryptocurrency as he suggested and

25  specifically it was Monero.

PETER OLINITS - DIRECT EXAMINATION

1  Q.  What is Monero?

2  A.  Monero is an untraceable form of cryptocurrency.

3  Q.  And based on your experience in espionage cases, why would

4  an individual request Monero payment?

5  A.  Because it would be very difficult for law enforcement to

6  track.

7  Q.  What was the intent of the FBI in the communications with

8  the sender of that letter?

9  A.  To try to gain bona fides in an effort to develop our

10  relationship where we could start passing information that

11  wasn't in an electronic form; i.e., some kind of dead drop or

12  some kind of in-person meeting.

13  Q.  Can you explain what a dead drop is?

14  A.  So a dead drop is a very common tradecraft maneuver that

15  the counterintelligence -- it's using counterintelligence.

16  Basically, it's a covert exchange of information where there's

17  no need to have a face-to-face information -- face-to-face

18  meeting.  One party will put something in a location -- and

19  obviously both parties know where it's at -- and then the other

20  party will likely also leave something.  And, therefore, the

21  information could be exchanged at the convenience of either

22  side.  But it reduces the need to have a face-to-face meeting.

23  Q.  But it still allows the FBI to identify and ultimately

24  arrest the person who is sharing the Restricted Data; correct?

25  A.  That is correct.

PETER OLINITS - DIRECT EXAMINATION

1  Q.  What happened next on the investigation?  Was there

2  actually a dead drop that took place?

3  A.  Yes.  On June 26th in Jefferson County at approximately

4  10:41 A.M., the FBI observed Jonathan and Diana, with the

5  assistance of Diana, fill a dead drop location.

6  Q.  Were you present on June 26th in Jefferson County,

7  West Virginia?

8  A.  I was.

9  Q.  And you observed the dead drop operation?

10  A.  I did.

11  Q.  Did the FBI memorialize the dead drop in both still images

12  and video surveillance?

13  A.  We did.

14  Q.  Could you explain to us how Diana and Jonathan Toebbe

15  arrived at the dead drop location and where they parked?

16  A.  So we weren't able to identify them until after they had

17  returned to their vehicle and we were able to get their license

18  plate.  But subsequent investigation revealed that they both

19  drove together in their BMW Mini Cooper and parked in a

20  visitors parking lot approximately a mile and a half away from

21  the dead drop location.  It's important to note, I believe,

22  that there are several parking lots that were much closer to

23  the dead drop location, however, they parked at one that was a

24  mile and a half away.  They both exited the vehicle and walked

25  to the dead drop location, approximately a mile and a half.

PETER OLINITS - DIRECT EXAMINATION

1   That is indicative of normal tradecraft of espionage subjects.

2   What we would call a surveillance detection route or an SDR.

3   During that time, for a mile and a half, you're able to

4   determine if you're being followed or if there's anybody

5   suspicious where you might be able to kind of get out of that

6   situation before you actually exchange the information.  So I

7   will talk about it later, but they conducted many SDRs

8   throughout this investigation.

9   Q.  Okay.

10          MS. SMOLAR:  Your Honor, permission to approach the

11  witness with an exhibit?

12          THE COURT:  You may.  Has the exhibit been marked?

13          MS. SMOLAR:  Yes.

14          THE COURT:  Okay.  Thank you.  And what exhibit --

15          MS. SMOLAR:  They've all been marked, and I'll

16  provide them to counsel as well.

17          THE COURT:  All right.  Thank you.

18  BY MS. SMOLAR:

19  Q.  Special Agent, can you tell us and identify for us

20  Government's Exhibit 1, please.

21  A.  So this is a picture of the -- it's a silver BMW Mini

22  Cooper that was parked in the parking lot in Jefferson County a

23  mile and a half away from the dead drop location.

24  Q.  And is that the car that Diana and Jonathan Toebbe arrived

25  at the dead drop location in?

PETER OLINITS - DIRECT EXAMINATION

1   A.   Yes.

2   Q.   And do you know who the car is registered to?

3   A.   Diana.

4          MS. SMOLAR:  Your Honor, I'd ask that Government's

5   Exhibit 1 be admitted.

6          THE COURT:  Mr. MacMahon, any objection to the

7   admission of defendant's -- Government's Exhibit No. 1?

8          MR. MACMAHON:  No, Your Honor.

9          THE COURT:  It'll be so admitted.

10      (Government's Exhibit No. 1 was admitted.)

11   BY MS. SMOLAR:

12   Q.   Once they arrived at the park and did the mile-and-a-half

13   drive, what did you observe them doing next?

14   A.   So they walked to the location and paused for some time in

15   and around the dead drop location itself posing as tourists.

16   Again, typical tradecraft of espionage subjects.  Dressed like

17   hikers.  And so we -- Diana had a camera and was taking

18   photographs of the scenery.  They were both -- Jonathan had a

19   backpack on.  She had a large pack around her waist.  And they

20   kind of hung out in that area until basically there was no one

21   around.

22   Q.   They were together the entire time?

23   A.   Yes.

24          MS. SMOLAR:  Your Honor, at this time, I'd like to

25   show the witness Government's Exhibit 2.

PETER OLINITS - DIRECT EXAMINATION

1     THE COURT:  Yes, you may.

2  BY MS. SMOLAR:

3  Q.  Agent, can you identify Government's Exhibit 2 for us,

4  please.

5  A.  Yes.  This is a picture of Jonathan Toebbe and Diana Toebbe

6  walking from their vehicle to the dead drop location.

7  Q.  And they're both wearing hats; correct?

8  A.  Yes.

9  Q.  And sunglasses?

10  A.  Sunglasses, hats, typical wear that you would have in the

11  specific area of Jefferson County to blend in.

12  Q.  And just to be clear, all of these photos that I'm about to

13  show you were photos taken by FBI surveillance; correct?

14  A.  Yes.

15     MS. SMOLAR:  I'd ask that Government's Exhibit 2 be

16  admitted.

17     THE COURT:  Any objection?

18     MR. MACMAHON:  No, Your Honor.

19     THE COURT:  It'll be so admitted.

20     (Government's Exhibit No. 2 was admitted.)

21  BY MS. SMOLAR:

22  Q.  Let's discuss a little bit about what Diana Toebbe was

23  doing during the course of the dead drop.  What did you observe

24  her doing?

25  A.  So, again, Diana and Jonathan were near each other the

PETER OLINITS - DIRECT EXAMINATION

1  whole time.  There was a couple other people in the area, and

2  they waited until they cleared out.  They approached the dead

3  drop location where Jonathan clearly identified and Diana

4  clearly identified where they needed to walk to.  As the dead

5  drop was serviced by Jonathan, Diana was right behind him

6  within a meter away -- she can probably almost touch him --

7  basically keeping a lookout to make sure that no one was coming

8  up on either of them during that operation.

9          MS. SMOLAR:  I'd like to show the witness

10  Government's Exhibit 3.

11          THE COURT:  All right.

12  BY MS. SMOLAR:

13  Q.  Agent, can you describe for us what we're seeing in

14  Government's Exhibit 3, please.

15  A.  This is a photo of Diana acting as a lookout for Jonathan

16  as he's servicing the dead drop.  Again, looking all around at

17  different directions for anybody that may approach --

18          MR. MACMAHON:  Your Honor, I object.  It's a still

19  picture.  She's not looking around in all directions.  The

20  agent is obviously well prepared to testify today, but that is

21  well beyond the scope of the question -- the picture would even

22  call for.  That's his conclusion.

23          MS. SMOLAR:  Your Honor, she's clearly looking away

24  from the defendant, but we also have video that we're happy to

25  share with the Court that will show --

PETER OLINITS - DIRECT EXAMINATION

1              THE COURT:  Given that this is a detention hearing,

2    and the Rules of Evidence are not necessarily applicable to

3    that, we're going to overrule your objection and allow the

4    testimony to continue.

5         Go ahead, please.

6    A.  At the end of the dead drop when Jonathan clearly finished

7    serving -- servicing it, Diana provided a very distinctive head

8    nod as if they needed to get out of the area, and I observed

9    that.

10   BY MS. SMOLAR:

11   Q.  And to be clear, in the picture is Jonathan on the ground

12   right below Diana?

13   A.  Yes.

14              MS. SMOLAR:  I'd ask that Government's Exhibit 3 be

15   admitted.

16              THE COURT:  Mr. MacMahon, any objection?

17              MR. MACMAHON:  No objection, Your Honor.

18              THE COURT:  It will be so admitted.

19        (Government's Exhibit No. 3 was admitted.)

20              MS. SMOLAR:  Permission to approach the witness, Your

21   Honor?

22              THE COURT:  You may.

23   BY MS. SMOLAR:

24   Q.  Agent, can you tell us what we're seeing in Government's

25   Exhibit 4, please.

PETER OLINITS - DIRECT EXAMINATION

1   A.   It's, again, a picture of Diana directly looking at the

2   dead drop and Jonathan servicing it.

3   Q.   How far away from each other, based on your observation at

4   the time, were they?

5   A.   Two to three feet maybe.  No more.

6   Q.   What's around Diana's waist?

7   A.   It's a -- I believe it's a camera bag but -- kind of just a

8   waist bag.

9          MS. SMOLAR:  Government moves to admit Government's

10  Exhibit 4, please.

11         THE COURT:  Any objection, sir?

12         MR. MACMAHON:  No, Your Honor.

13         THE COURT:  It'll be so admitted as Government's

14  Exhibit 4.

15     (Government's Exhibit No. 4 was admitted.)

16  BY MS. SMOLAR:

17  Q.   Did the FBI also capture video of -- video surveillance of

18  Diana and Jonathan Toebbe on June 26th of 2021 at -- in

19  Jefferson County, West Virginia, at this dead drop?

20  A.   Yes, ma'am.

21         MS. SMOLAR:  Your Honor, we would request permission

22  to show the Court and defense counsel an excerpt of that

23  video.

24         THE COURT:  You may.  Now, we're going to make sure

25  that this is not on the Zoom video feed or published to the

PETER OLINITS - DIRECT EXAMINATION

1   rest of the participants here in the courtroom other than the

2   parties themselves.  So are we ready to do that?

3       All right.  You may proceed.

4   BY MS. SMOLAR:

5   Q.  And, Agent, we're about to show Government's Exhibit 5

6   which is a composite exhibit of three videos.  And this is from

7   June 26, 2021; correct?

8       (Play video.)

9   A.  Am I supposed to watch down here?  Yes, this is correct.

10  Q.  Okay.  We'll just watch, and then I'll ask you questions.

11      (Play video.)

12  BY MS. SMOLAR:

13  Q.  Agent, can you tell us, based on your observation of the

14  video, what matters of relevance does it raise for you as an

15  espionage agent?

16  A.  So, again, the drop was completed fairly quickly which is

17  very good tradecraft.  They weren't sitting on the "X," per se,

18  very long.  He was able to do it with the cover of Diana

19  helping as a lookout.  They conducted an SDR by walking a mile

20  and a half to that location.  Thereafter, they walked quite a

21  long distance again, probably around a half a mile more,

22  conducting additional SDRs to make sure they're not being

23  followed.

24  Q.  And what specifically did you notice about Diana's

25  behavior?

PETER OLINITS - DIRECT EXAMINATION

1  A.  She was intent on watching both the location of where

2  Jonathan was and around their surroundings to ensure nobody

3  else was coming up on them while that was being serviced.

4        MS. SMOLAR:  The government moves to admit Exhibit 5

5  with regard to this video.

6        THE COURT:  Any objection, sir?

7        MR. MACMAHON:  No objection.

8        THE COURT:  You may turn it back on.

9     Yes, it will be admitted.  Thank you.

10     (Government's Exhibit No. 5, excerpt, was admitted.)

11        THE COURT:  You may proceed.

12  BY MS. SMOLAR:

13  Q.  Did the FBI retrieve the item that was left by Diana and

14  Jonathan Toebbe from the dead drop?

15  A.  We did.

16  Q.  And what was it?

17  A.  Basically, it was an additional -- it was an additional

18  sample of classified information regarding the Virginia-class

19  submarines.  And what it was, was on an SD card that was

20  wrapped in Saran Wrap, placed between two pieces of bread on a

21  peanut butter sandwich, which was in a bag.  That was what was

22  left in the dead drop.

23        MS. SMOLAR:  Your Honor, I'd ask to approach the

24  witness?

25        THE COURT:  You may.

PETER OLINITS - DIRECT EXAMINATION

1    BY MS. SMOLAR:

2    Q.  We're looking at Government's Exhibit 6.  Can you identify

3    that for us, please.

4    A.  Yes.  Again, that's the SD card that was put in the dead

5    drop location serviced by Jonathan with the assistance of

6    Diana.

7    Q.  And the blue thing that we're seeing on -- in the midst of

8    the sandwich that's the SD card?

9    A.  Yes, ma'am.

10          MS. SMOLAR:  Move to admit Government's Exhibit 6,

11   please.

12          THE COURT:  Any objection, sir?

13          MR. MACMAHON:  No, Your Honor.

14          THE COURT:  It'll be so admitted.

15     (Government's Exhibit No. 6 was admitted.)

16   BY MS. SMOLAR:

17   Q.  Did the FBI then pay for the password to that SD card?

18   A.  Yes.  So the information that was contained on the SD card

19   was encrypted.  So in order for us to decrypt it, we paid

20   $20,000 in Monero for that decryption code.

21   Q.  So you paid cryptocurrency of $20,000 at that time?

22   A.  Yes.

23   Q.  And you'd previously paid $10,000 in cryptocurrency as

24   well; correct?

25   A.  Correct.

PETER OLINITS - DIRECT EXAMINATION

1  Q.  And were you able to decrypt the SD card?

2  A.  Yes.

3  Q.  What did it contain?

4  A.  So, again, it did contain additional information that was

5  classified Confidential Restricted Data to the United States

6  Navy.  It also contained a typed message.  It was in electronic

7  format but a message from this individual.

8  Q.  And did the SD card contain specific Restricted Data

9  relating to the Virginia-class submarine reactors?

10  A.  Yes, it did.

11  Q.  And that was determined by a subject matter expert for the

12  United States Navy?

13  A.  Yes.  By a subject matter expert.

14  Q.  You said there was also a letter?

15  A.  Yes.  There was a letter, and I have an excerpt here.

16  Q.  Can you read us an excerpt of that letter, please.

17  A.  So the letter reads, "I hope your experts are very happy

18  with the sample provided, and I understand the importance of a

19  small exchange to grow trust.  Most of the material I possess

20  is similar in format.  Multiple pages per sheet.  Drafted

21  drawings are split over several regular sheets to preserve good

22  detail.  And I used color where it seemed important like graphs

23  and several lines.

24      "For now I propose we continue with weekend exchanges at

25  suitable parks and trails similar to this one.  Details of my

PETER OLINITS - DIRECT EXAMINATION

1  daily routine may narrow an investigator's search too much if

2  your organization is infiltrated by an adversary one day.

3  Hiking and visiting historical sites is easier to explain than

4  unexpected stops during rush hour if they ever take a special

5  interest in me.

6      "I hope you will forgive my excess caution.  I want our

7  relationship to be very successful for both of us -- for us

8  both and that means that I must be careful at every step."

9  Q.  Did the FBI investigate the metadata of that SD card?

10 A.  Yes.  So the information on the SD card that was sent to

11 COUNTRY1 in April 2020 was -- we could tell it was a Macintosh

12 operating system.  That same operating system was the metadata

13 that was on this card as well.

14 Q.  And we'll get to the search of the Toebbe home, but let's

15 just briefly touch on that now.  At the time of the arrest of

16 the defendants in this case, was there a search of their

17 residence?

18 A.  Yes.  In Annapolis, Maryland.

19 Q.  And were Macintosh items found in that home --

20 A.  Yes.

21 Q.  -- electronic items?

22 A.  Yes.

23 Q.  Was there another dead drop that took place in this case

24 after the June 26, 2021, dead drop?

25 A.  There was.  There was another dead drop on July 31, 2021,

PETER OLINITS - DIRECT EXAMINATION

1   in South Central Pennsylvania.

2   Q.  Were you present for that dead drop as well?

3   A.  Yes.

4   Q.  And was Diana Toebbe also present at that dead drop?

5   A.  Yes.  That morning they drove -- they left their residence

6   and drove in the BMW Mini Cooper to the South Central

7   Pennsylvania location.  We also know from geolocational data of

8   their cellular devices that Jonathan left his cell phone on and

9   at his residence.

10  Q.  As an investigator, what does that mean to you?

11  A.  It's an obvious way to try to obfuscate surveillance and

12  FBI potentially tracking geolocational data with their cellular

13  device.

14  Q.  And where was Diana's phone that day?

15  A.  She had it on in the vehicle until they arrived to the

16  location where she either turned it off or put it in WiFi mode

17  because the location --

18          MR. MACMAHON:  Your Honor, I object.  If he doesn't

19  know, he doesn't know.  He's speculating now as to what she did

20  with her phone.

21          THE COURT:  I understand.  Go ahead with your --

22  what's your response to the objection?

23          MS. SMOLAR:  I can ask a few more questions to get to

24  that.

25          THE COURT:  Let's go ahead and ask a few more

PETER OLINITS - DIRECT EXAMINATION

1  questions, please.

2  BY MS. SMOLAR:

3  Q.  At the time of Ms. Diana Toebbe's arrest, what did she tell

4  you -- what -- what did she tell you about the location of her

5  phone?

6  A.  She had her phone on and it was in WiFi mode.

7  Q.  You mean airplane mode?

8  A.  I'm sorry.  Apology.  Airplane mode.

9  Q.  What is airplane mode?

10  A.  It's a way to put your phone on so it's not communicating

11  with cellular towers.

12  Q.  So if, for example, the FBI is tracking your cell phone and

13  it's in airplane mode, you can't tell where it is; correct?

14          MR. MACMAHON:  Your Honor, I object --

15  A.  Correct.

16          MR. MACMAHON:  -- to the leading question.  There's

17  no way to link that to this case.

18          MS. SMOLAR:  It's a detention hearing, Your Honor.

19          THE COURT:  This is a deten -- thank you.  It's a

20  detention hearing.  I'm going to allow it.  I think the Court

21  has an understanding of what leading questions are and what

22  information can be gleaned from this information so I'm going

23  to allow it.

24  BY MS. SMOLAR:

25  Q.  Now, you said that Diana was present with Jonathan at this

PETER OLINITS - DIRECT EXAMINATION

1  dead drop location.  What did you observe her doing

2  specifically on that day?

3  A.  Again, they meandered around that area for approximately

4  one hour before servicing the dead drop together.  As they

5  approached the location of the dead drop, the location was set

6  so that the geographic terrain was kind of on a hill, and the

7  location of the drop was behind a large boulder.  And so Diana

8  strategically placed herself at a higher level to continue the

9  lookout position while he serviced the dead drop because where

10  she was, she was able to see a parking lot and basically behind

11  where Jonathan was was nothing but trees.

12      MS. SMOLAR:  I'd like to show the witness

13  Government's Exhibit 7.

14      THE COURT:  You may.

15  BY MS. SMOLAR:

16  Q.  Like the other dead drops, the FBI had both still images

17  and video surveillance of this dead drop; correct?

18  A.  Yes.

19  Q.  And is this one of the still images?

20  A.  It is.

21  Q.  Can you identify what we're seeing in this Government's

22  Exhibit 7?

23  A.  So Jonathan Toebbe is servicing the dead drop and actually

24  in this particular picture, he's taking out a letter left by

25  the FBI.

PETER OLINITS - DIRECT EXAMINATION

1   Q.  So let's talk about that for a minute.  This dead drop was

2   a little bit different.  There was not going to be -- well,

3   tell us why it was different.

4   A.  So this was more of an information exchange.  As part of

5   the undercover operation, we didn't ask for classified

6   information.  We more or less wanted to know what this

7   individual had access to.  How much of it they had access to.

8   Try to gain some bone fides between us as the undercovers and

9   the targets.

10  Q.  And in this picture, it appears that Mr. Toebbe is looking

11  up.  Do you know, based on your observation that day, what was

12  above him?

13  A.  It was Diana.

14          MS. SMOLAR:  Move to admit Government's Exhibit 7.

15          THE COURT:  Any objection, sir?

16          MR. MACMAHON:  No objection, Your Honor.

17          THE COURT:  Be so admitted as Government's

18  Exhibit 7.

19      (Government's Exhibit No. 7 was admitted.)

20  BY MS. SMOLAR:

21  Q.  I'd like to show you Government's Exhibit 8.

22      Special Agent, can you tell us what we see on Government's

23  Exhibit 8?

24  A.  So right prior to that, the FBI observed Jonathan not only

25  take out that envelope but also place in something which was

PETER OLINITS - DIRECT EXAMINATION

1  later discovered to be a Band-Aid.  And, again, contained

2  within the Band-Aid, which was sealed, was an SD card and that

3  was wrapped within a plastic bag.  So right after he serviced

4  this, they rendezvoused together and walked away together out

5  of the area, got into their BMW Mini Cooper, and drove away.

6          MS. SMOLAR:  Your Honor, at this time, I'd request

7  permission to play for the Court and defense counsel the video

8  from Exhibit 5 on July 31, 2021.

9          THE COURT:  That's fine.  We'll go ahead and turn off

10  the Zoom feed as it relates to Exhibit 5.

11      All right.  You may proceed.

12      (Play video.)

13  BY MS. SMOLAR:

14  Q.  Special Agent, based on your --

15          THE COURT:  Hold on.  All right.  You may proceed.

16  BY MS. SMOLAR:

17  Q.  Special Agent, based on your training and experience, what

18  did you take away from that video?

19  A.  Again, the time on the "X" and the time at the dead drop

20  was very limited which is a very good tradecraft technique by

21  espionage subjects.  Jonathan clearly had Diana watching as a

22  lookout.  You can clearly see Jonathan take something out of

23  his left pocket and place it into the location and also clearly

24  take out a letter.  Right after it was serviced, there was a

25  nonverbal signal given by Jonathan to Diana where they met up

PETER OLINITS - DIRECT EXAMINATION

1  on the trail and walked away and again drove out of the area.

2        MS. SMOLAR:  Government moves to admit the video on

3  Exhibit 5 from July 31st.

4        THE COURT:  Any objection, sir?

5        MR. MACMAHON:  No objection, Your Honor.

6        THE COURT:  It'll be so admitted.

7     (Government's Exhibit No. 5, excerpt, was admitted.)

8  BY MS. SMOLAR:

9  Q.  I'm going to show you what's been marked as Government's

10  Exhibit 9.

11     Special Agent, can you identify what we're seeing in

12  Government's Exhibit 9?

13  A.  This is a picture after the FBI opened the Band-Aid.  So,

14  again, what was happening was Jonathan took this out of his

15  left pocket and left it in the dead drop.  The FBI later

16  recovered it.  The Band-Aid was sealed potentially with some

17  adhesive or something, but it was as if it was not opened at

18  all.  When we opened it, it's just a typical Band-Aid, and

19  inside of it was a 32 gigabyte SD card that was hidden.

20  Q.  Is 32 gigabytes a large size?

21  A.  I'm not sure.

22  Q.  Okay.  And on the SD card, was there -- did you -- were you

23  able to access the SD card?

24  A.  Yes.  So we exchanged information again to decrypt it

25  because it was encrypted, but there was no money exchange.  But

PETER OLINITS - DIRECT EXAMINATION

1  we were able to open it up.

2  Q.  And did it contain the Navy's Restricted Data?

3  A.  No.

4  Q.  What did it contain?

5  A.  It contained basically a letter to us explaining what this

6  individual had access to.

7  Q.  And what did the individual say that he or she had access

8  to?

9  A.  Basically --

10  Q.  You're welcome to read it.

11  A.  Okay.  Basically if you add it all up, it's a little more

12  than 11,000 pages of classified material that they're willing

13  to send to us in exchange for additional money.

14  Q.  And does the letter indicate how this data was taken from

15  the United States Navy?

16  A.  Yes.  So let me just read this little excerpt.  It will

17  clarify that question.

18    "I hope your experts are very happy with the sample

19  provided."  Which he was referring to the Jefferson County

20  drop.

21    "This information was slowly and carefully collected over

22  several years in the normal course of my job to avoid

23  attracting attention and smuggled past security checkpoints a

24  few pages at a time.  I can answer your expert's questions

25  using my knowledge.  I've divided the [REDACTED] into 51

PETER OLINITS – DIRECT EXAMINATION

1  packages.  All but the last have 100 sheets each.  The first

2  contains the [REDACTED] and the first of the drawings.  If I

3  understand your letter correctly, you offer an additional

4  $70,000 in Monero for the [REDACTED].  I propose the same

5  payment schedule for the remaining files:  100,000 U.S. dollars

6  in Monero for each of the 49 packets -- there's nothing -- not

7  additional for 51.  In total, $5 million in U.S. -- U.S.

8  dollars in Monero."

9      And then he concludes -- and concludes, "My friend, we have

10  both taken considerable risks to reach this point and with good

11  luck we will have -- will soon have much to celebrate."

12  Q.  So to --

13          MS. SMOLAR:  Your Honor, at this time, I'd ask that

14  Government's Exhibit 9 be admitted.

15          THE COURT:  Any objection, sir?

16          MR. MACMAHON:  No objection, Your Honor.

17          THE COURT:  It will be so admitted.

18      (Government's Exhibit No. 9 was admitted.)

19  BY MS. SMOLAR:

20  Q.  So to summarize, based on what you just read to us, the

21  writer of that letter was offering 51 packages of Restricted

22  Data for a total of $5 million in cryptocurrency?

23  A.  That's correct.

24  Q.  Did the FBI agree to the demands set out in the letter?

25  A.  Yes.

PETER OLINITS - DIRECT EXAMINATION

1   Q.   And was another dead drop then set up?

2   A.   Yes.

3   Q.   And where was that one set up for?

4   A.   So that one was set up for August 28th in eastern Virginia.

5   Q.   What did the FBI observe on August 28, 2021, with regard to

6   this dead drop?

7   A.   So the FBI observed Jonathan Toebbe arrive at this dead

8   drop alone where he serviced it.

9   Q.   And location information for Diana's whereabouts, what did

10  that tell you?

11  A.   She was at their residence in Annapolis, Maryland.

12  Q.   And based on your investigation, do you have an

13  understanding of why she was not with him?

14  A.   So prior to that, the FBI learned through investigation and

15  through observation that Diana had ankle surgery, and she was

16  wearing a walking boot.  And the location of the eastern

17  Virginia dead drop was a rough terrain, and it would likely be

18  difficult for her to walk into that.

19  Q.   You were present on the August 28, 2021, dead drop?

20  A.   Yes.

21  Q.   And what did you observe of Jonathan's demeanor on that

22  day?

23  A.   Jonathan was extremely nervous.  More nervous than we've

24  seen him on the previous ones and just very cautious of what

25  was going on around him.

PETER OLINITS - DIRECT EXAMINATION

1  Q.  Based on your training and experience, what did you

2  attribute that nervousness to?

3  A.  Because Diana was not there to act as a lookout.

4  Q.  Did Jonathan leave something for -- in the dead drop?

5  A.  Yes.  Again, he had left -- and it was exchange of

6  information.  He took our information and left information.

7  Q.  And did the FBI retrieve another SD card from this dead

8  drop?

9  A.  Yes.  It was housed within a package of gum.

10  Q.  And did the SD card contain Restricted Data relating to the

11  United States Navy?

12  A.  It contained 1 of the 51 packets of the Restricted Data.

13  Q.  And the FBI paid how much Monero cryptocurrency for this

14  data?

15  A.  $70,000.

16  Q.  Was there also a letter in with this SD card?

17  A.  Yes.

18  Q.  Can you please read the relevant portions of that letter?

19  A.  "I have considered the possibility -- the possible need to

20  leave on short notice.  Should that ever become necessary, I

21  will be forever grateful for your help extracting me and my

22  family.  I surmise the first step would be unannounced travel

23  to a safe third country with plans to meet your colleagues.  We

24  have passports and cash set aside for this purpose.  I pray

25  such a drastic plan will never be needed, but you are right.

PETER OLINITS - DIRECT EXAMINATION

1  It is a comfort to know you are ready and willing to aid us.

2  Please let me know what I should do to prepare for this last

3  resort.

4     "You asked if I am working alone.  There's only one other

5  person I know is aware of our special relationship, and I trust

6  that person absolutely.  I was extremely careful to gather the

7  files I possess slowly and naturally in the routine of my job

8  so no one would suspect my plan.  We received training on

9  warning signs to spot insider threats.  We made very sure not

10  to display even one -- even a single one.  I do not believe any

11  of my former colleagues would suspect me if there is a future

12  investigation.

13     "Thank you for your partnership as well as my -- as well,

14  my friend.  One day when it is safe, perhaps two old friends

15  will have a chance to stumble into each other at a cafe, share

16  a bottle of wine, and laugh over stories of their shared

17  exploits.  A fine thought but I agree that our mutual need for

18  security may make that impossible.  Whether we meet or not, I

19  will always remember your bravery in serving your country and

20  your commitment to helping me."

21     Signed, "Alice."

22  Q.  Special Agent, you just read that there was -- the letter

23  states, "There was only one other person I know is aware of our

24  special relationship, and I trust that person absolutely."

25     And then it also says, "We received training on warning

PETER OLINITS - DIRECT EXAMINATION

1  signals to spot insider threats.  We made sure -- we made very

2  sure not to display even a single one."

3     Based on your training and experience in espionage cases,

4  what stands out to you about those statements?

5  A.  It's the first time that a letter was passed to the FBI

6  where the pronoun "we" was used multiple times.  It clearly

7  states that there was somebody else that was aware of this

8  relationship, and the FBI is only aware of Diana assisting him

9  in this investigation.

10 Q.  How many of the dead drops -- there were four dead drops

11 total; correct?

12 A.  Yes.

13 Q.  How many of those four dead drops did Diana assist Jonathan

14 with?

15 A.  Three.

16 Q.  So there was another dead drop that was planned after the

17 August 28th one; correct?

18 A.  Correct.  That was, again, in Jefferson County in

19 West Virginia on October 9th.

20 Q.  What was the FBI expecting to receive at that dead drop?

21 A.  So in the exchange of information in the Eastern

22 District -- in the eastern Virginia dead drop, the FBI

23 requested five additional 100-page package -- packets for a

24 total of $500,000.  So there will be potentially 500 pages of

25 additional classified information.

PETER OLINITS - DIRECT EXAMINATION

1  Q.  You were present on October 9, 2021, in Jefferson County,

2  West Virginia?

3  A.  Yes.

4  Q.  And who else was present at that dead drop location --

5  A.  Diana.

6  Q.  -- of the defendants?  Was it both Jonathan --

7  A.  Jonathan and Diana.

8  Q.  -- and Diana?

9  A.  Yes.

10  Q.  Did the FBI document this dead drop with still images and

11  video surveillance?

12  A.  Yes.

13  Q.  And what -- tell us about the status of both of their

14  phones on that day.

15  A.  Again, geolocational information on Jonathan's phone showed

16  that it was on and at home.  Diana's phone was in airplane

17  mode, and it was working fine all morning not in airplane mode

18  until she got in the vehicle to drive to Jefferson County where

19  at that point, the geolocational information failed to register

20  so the airplane mode was turned on.

21  Q.  And when she was arrested, what did she tell you about the

22  status of her cell phone?

23  A.  She said it was in airplane mode.

24  Q.  How long was the drive from their home in Annapolis,

25  Maryland, to the dead drop location?

PETER OLINITS - DIRECT EXAMINATION

1   A.   I think it was like an hour and a half.

2   Q.   Each way; correct?

3   A.   Yes.

4   Q.   And did they leave anyone at home during their drive to

5   West Virginia?

6   A.   They left their 11-year-old minor child at home alone.

7   Q.   And how do you know that?

8   A.   Through surveillance and a subsequent search warrant at

9   their residence revealed that that individual was the only

10  person at home.

11  Q.   If a phone was on airplane mode and another phone was in

12  the house, based on your experience, how would that 11-year-old

13  child be able to contact his parents by phone?

14  A.   They would not be able to.

15  Q.   Going to show you what's been marked as Government's

16  Exhibit 10.

17       Can you please identify what we are seeing on Government's

18  Exhibit 10?

19  A.   So this was a drop location in Jefferson County,

20  West Virginia, on October 9, 2021.   Jonathan is servicing the

21  dead drop.   Again, with Diana acting as a lookout.

22  Q.   How close would you say Diana is to Jonathan in this

23  picture?

24  A.   A couple feet away.

25            MS. SMOLAR:   Move to admit Government's Exhibit 10.

PETER OLINITS - DIRECT EXAMINATION

1          THE COURT:  Any objection, sir?

2          MR. MACMAHON:  No, Your Honor.

3          THE COURT:  It will be so admitted as Government's

4   Exhibit 10.

5      (Government's Exhibit No. 10 was admitted.)

6   BY MS. SMOLAR:

7   Q.  I want to show you what's been marked as Government's

8   Exhibit 11.

9          MS. SMOLAR:  And I'd move to admit Government's --

10  oh, I did that.  Sorry.

11  BY MS. SMOLAR:

12  Q.  Can you please identify Government's Exhibit 11?  Is this

13  one of the photos that the FBI took from the October 9th dead

14  drop?

15  A.  Yes.

16  Q.  What's happening in this photo?

17  A.  Again, they're arriving at the location of the dead drop

18  together.  They are clearly looking around for potentially

19  people that could see them doing it.  And when it was serviced,

20  there was no one in the area.

21         MS. SMOLAR:  Move to admit Government's Exhibit

22  11.

23         MR. MACMAHON:  No objection, Your Honor.

24         THE COURT:  It'll be so admitted.

25     (Government's Exhibit No. 11 was admitted.)

PETER OLINITS - DIRECT EXAMINATION

1  BY MS. SMOLAR:

2  Q.  I'm going to show you what's been marked as Government's

3  Exhibit 12.

4      Agent, is this another angle of the same dead drop?

5  A.  It is.

6  Q.  What are we seeing here?

7  A.  So actually in the previous picture, you can see that

8  Jonathan was holding a water bottle.  In this picture, she is

9  holding Jonathan's water bottle as she's acting as a lookout

10  while he services the drop.

11          MS. SMOLAR:  Move to admit Government's Exhibit 12.

12          MR. MACMAHON:  No objection, Your Honor.

13          THE COURT:  It'll be so admitted.

14      (Government's Exhibit No. 12 was admitted.)

15  BY MS. SMOLAR:

16  Q.  Did the FBI also have video surveillance of this dead

17  drop?

18  A.  Yes.

19          MS. SMOLAR:  Your Honor, at this time, I'd ask that

20  we show Government's Exhibit 5, the last video, to the Court

21  and to defense counsel.

22          THE COURT:  Are we ready to proceed with that?

23          THE CLERK:  Yes.

24          THE COURT:  All good?

25      All right.  You may proceed.

PETER OLINITS – DIRECT EXAMINATION

1      (Play video.)

2              THE CLERK:  Go ahead and turn it on (indiscernible).

3              THE COURT:  You may proceed.

4              MS. SMOLAR:  Turn it back on.  Just give me a second,

5      please.

6              THE COURT:  All right.

7      BY MS. SMOLAR:

8      Q.  Agent, based on your training and experience, can you tell

9      us what you observed of relevance in that video?

10     A.  Again, walking down to the trail together.  Looking around.

11     Specifically, Diana making sure she was watching the

12     surroundings as a dead drop was being serviced.  A very quick

13     service which is very typical of tradecraft of espionage

14     subjects.  They don't want to be on the "X" too long.  And,

15     again, walking away together.  Dressed as you would if you were

16     taking a hike in the woods.

17             MS. SMOLAR:  Move to admit the last video on

18     Government's Exhibit 5.

19             MR. MACMAHON:  No objection, Your Honor.

20             THE COURT:  It'll be so admitted.

21      (Government's Exhibit No. 5, excerpt, was admitted.)

22     BY MS. SMOLAR:

23     Q.  What was left at the dead drop by Diana and Jonathan Toebbe

24     that day?

25     A.  So it was an additional SD card.  Again, in a gum wrapper.

PETER OLINITS - DIRECT EXAMINATION

1   A gum package.

2   Q.  I'm going to show you what's been marked as Government's

3   Exhibit 13.

4       Could you please identify Government's Exhibit 13?

5   A.  So it's a Dentyne Ice gum packet where one of the pieces of

6   gum is pushed through the foil, and replaced is a small SD card

7   that fits in that specific spot.  And that's what was left at

8   the drop location.

9           MS. SMOLAR:  Move to admit Government's Exhibit 13.

10          MR. MACMAHON:  No objection, Your Honor.

11          THE COURT:  It will be so admitted.

12      (Government's Exhibit No. 13 was admitted.)

13  BY MS. SMOLAR:

14  Q.  The defendants were arrested on October 9th after making

15  this drop; correct?

16  A.  Yes.  Both.

17  Q.  And was the FBI able to access this SD card?

18  A.  No.

19  Q.  Was the FBI able to determine what was on the SD card in

20  general?

21  A.  Yes.  So, again, we asked for 500 pages.  Five 100-page

22  documents of classified Navy information.  When we looked at

23  the SD card, we saw five large PDF files.  We saw -- and they

24  were encrypted.  We saw one text file which was encrypted which

25  we believe is likely a letter because that's what's been

PETER OLINITS - DIRECT EXAMINATION

1   happening in all these other subsequent ones or previous ones.

2   And there was one unencrypted Monero address so which we would

3   be able to pay them, and they would be able to give us the

4   decryption code to access these packets of information.

5   Q.  Was a search conducted at the Toebbe residence on

6   October 9th after their arrest?

7   A.  Yes.

8   Q.  By the FBI?

9   A.  Yes.

10  Q.  And what was that address?

11  A.  125 Boyd Drive in Annapolis, Maryland.

12  Q.  Just generally can you tell us the types of things that

13  were located in that home?

14  A.  So the FBI recovered a crypto-wallet, shredded documents,

15  $11,300 in cash, children's valid passports, information

16  contained about their passports.  There was a go-bag in their

17  bedroom that contained a Macintosh computer, a USB drive, and

18  some latex gloves in the backpack.  We also were able to

19  identify Jonathan's iPhone in the on position, plugged in,

20  charging in their bedroom among other things that we were able

21  to identify.

22          MS. SMOLAR:  Your Honor, at this time, I'd like to

23  show the witness Government's Exhibit 14 to 25 just to speed

24  things up a bit.  I'll provide a packet to everyone of those

25  exhibits.

PETER OLINITS – DIRECT EXAMINATION

1    THE COURT:  That's fine.  Go ahead.

2  BY MS. SMOLAR:

3  Q.  Special Agent, I'm going to take -- ask you to take a look

4  at Government Exhibits 14 to 25.  We will go through each one

5  individually, but can you tell us generally what this packet of

6  exhibits includes?

7  A.  It includes photographs that the FBI took of some of the

8  items I just described.

9  Q.  Okay.  Great.  Let's look at Government's Exhibit 14

10  specifically.  And can you tell us what some of the items that

11  we see in that photograph are and the location of that

12  photograph?

13  A.  Yeah.  The location of this photograph is in Jonathan and

14  Diana's bedroom.  Item number 4 is Jonathan's iPhone.  Item

15  number 9 is some type of box but within that box was $11,300 in

16  cash.  It appears to be a cardboard box.  Items number -- item

17  number 8 were the two minor children's passports that are

18  valid.  And item number 6 was the location of the

19  crypto-wallet.  It was in a container.  That was what that

20  picture shows.

21  Q.  Okay.

22    MS. SMOLAR:  Move to admit Government's Exhibit 14.

23    THE COURT:  Any objection, sir?

24    MR. MACMAHON:  No objection to any of these exhibits,

25  Your Honor, if that helps.

PETER OLINITS - DIRECT EXAMINATION

1              THE COURT:  All right.

2              MS. SMOLAR:  That will speed things up.

3              THE COURT:  That will speed things up quite a bit.

4    Thank you.

5        They'll all be admitted.  And you're referring to Exhibits

6    14 through --

7              MS. SMOLAR:  Through 25.

8              THE COURT:  Through 25.

9        (Government's Exhibit Nos. 14 through 25 were admitted.)

10   BY MS. SMOLAR:

11   Q.  If you could draw your attention to Government's Exhibit 15

12   and just tell us what that is.

13   A.  It's Jonathan Toebbe's iPhone that's plugged in in the on

14   position.

15   Q.  Turned on you mean?

16   A.  Turned on.

17   Q.  And Government's Exhibit 16?

18   A.  That's the cardboard box that the $11,300 was found in in

19   cash.

20   Q.  And Government's Exhibit 17.  Is that the cash you're

21   referring to?

22   A.  Yes.  It was $100 bills wrapped up in rubber bands.

23   Q.  All $100 bills?

24   A.  Yes.

25   Q.  Government's Exhibit 18.  Is that the go-bag that you

PETER OLINITS – DIRECT EXAMINATION

1   referred to?

2   A.   Yes.

3   Q.   Tell us what a go-bag is.

4   A.   It's a bag that you can utilize to get out of a situation

5   or leave very quickly.

6   Q.   And let's look at Government's Exhibit 19.  What was in the

7   go-bag?

8   A.   A Macintosh computer which is number 15 in this photograph.

9   Evidence item number 15.

10  Q.   And I'm going to ask you to turn your attention to

11  Government's Exhibit 20.  Is that the Macintosh with something

12  on top of it?

13  A.   Yes.  Latex gloves.

14  Q.   And were the latex gloves also found in the go-bag?

15  A.   Yes.

16  Q.   And just to go back to the Macintosh for a minute, did you

17  tell us earlier that the metadata from the SD cards that you

18  examined were from a Macintosh?

19  A.   Macintosh operating system, yes.

20  Q.   Government's Exhibit 21.  What's that?

21  A.   This is the USB drive that was also found in that go-bag.

22  Q.   Let's look at Government's Exhibit 22 and 23 together.

23  What is -- where was this item found and what is it?

24  A.   So this item was found in a different room of the house.

25  This appears to be in a laundry room.  They are -- it's a large

PETER OLINITS - DIRECT EXAMINATION

1  bag.  A trash bag full of shredded documents.

2  Q.  Just going to point out it looks like a lot of these

3  documents are in color.  Did any of the letters refer to color

4  photographs?

5  A.  Yes.  The writer of those letters that we were receiving as

6  part of the undercover operation indicated that they had

7  created color documents and graphs to make it easier for

8  COUNTRY1 to understand what they were looking at.

9  Q.  Let's look at Government's Exhibit 24 and 25.  Can you

10 explain what these two exhibits show?

11 A.  Sure.  Item 25 actually may be better to start with.  So

12 they're photographs of Diana and Jonathan.  Their passport

13 photographs.  On the top right of that -- of this exhibit, you

14 see only two photographs.  And there actually should be four so

15 two were missing.  In this same area, which was on their

16 kitchen table, we also found a United States Postal Service

17 receipt with a tracking number that was dated September 18,

18 2021, and it was directed towards Philadelphia, Pennsylvania.

19 Q.  And did your investigation reveal what was happening with

20 Diana and Jonathan's passports?

21 A.  So -- yes.  They had expired in February 2021.  And this

22 happened on a Saturday that we did this search.  On Monday the

23 FBI followed up with the Department of State, and they did

24 confirm that they had in their possession both of their

25 passports, and they were being processed in an expedited

PETER OLINITS - DIRECT EXAMINATION

1  fashion.

2  Q.  So they had requested expedited passports; correct?

3  A.  Yes.

4  Q.  Did you have an opportunity to examine as part of your

5  investigation whether Diana and Jonathan share a bank account?

6  A.  Yes.  And they do.

7  Q.  And did that bank account have a sufficient balance to

8  allow them to leave the United States?

9  A.  Yes.

10  Q.  We've talked about some of the things that you did find in

11  the house.  Let's talk about what you didn't find in the house.

12  Did you find the $100,000 in cryptocurrency Monero that was

13  paid by the FBI to the Toebbes?

14  A.  No.

15  Q.  Did you find the extra 50 packets of Restricted Data that

16  were offered to the FBI for $5 million in the home?

17  A.  We did not.

18  Q.  And you still haven't located those packets; correct?

19  A.  That's correct.

20  Q.  Based on your training and experience, you've discussed a

21  few things about tradecraft and what the Toebbes did to

22  disguise their identities and not get caught; correct?

23  A.  Yes.

24  Q.  We talked about airplane mode.  We talked about her acting

25  as a lookout.  Was there anything else that you have since

PETER OLINITS – DIRECT EXAMINATION

1    their arrest located on a search of any of their devices?

2    A.  Yes.  So a subsequent search of Jonathan's cell phone and

3    prior investigation revealed that Diana also had a Signal

4    account.  So there's a Signal account registered to Diana as

5    well as Jonathan.  And a Signal account is an encrypted

6    application to communicate.

7    Q.  Was there also a Telegram application on her phone?

8    A.  Yes.

9    Q.  What's that?

10   A.  It's also an encrypted application to communicate between

11   two parties.

12   Q.  Okay.  And during your review of that Signal application,

13   did you find any communications by Diana Toebbe that reflected

14   an interest in leaving the country?

15   A.  Yes.  We found quite a bit.

16   Q.  And did you prepare an exhibit for purposes of today's

17   hearing to read to the Court concerning these statements?

18   A.  Yes.

19   Q.  I'm going to show you Government's Exhibit 26.  Do you have

20   a copy?

21   A.  Yes.

22   Q.  So this is not all the communications that you have;

23   correct?

24   A.  No.

25   Q.  This is just an excerpt that you prepared for today's

PETER OLINITS - DIRECT EXAMINATION

1 hearing?

2 A.  Right.

3 Q.  Correct?  And it's from the Signal application?

4 A.  Yes.  That was found on Jonathan's phone.

5 Q.  Can you please read the date, the person stating the

6 statement, and the message for us, please.

7 A.  So there was four messages on March 4, 2019.  Jonathan

8 says, "I am also thinking about Plan A.  It's not morally

9 defensible either.  We convinced ourselves it was fine, but it

10 really isn't either, is it?"

11    Diana responded, "I have no problems at all with it.  I

12 feel no loyalty to abstractions."

13    Diana writes, "This was totally and completely different."

14    John writes, "Let's forget entirely about Plan B.  Wrong to

15 have even considered it.  I'm checking on A now."

16    On March 7, 2019, Jonathan writes, "We've got passports and

17 some savings.  In a real pinch, we can flee quickly."

18    Diana writes, "Right.  Let's go sooner than later."

19    Jonathan writes, "I really don't want to go back to making

20 $50,000 a year, especially not in a country where we don't know

21 the language."

22    Diana writes, "That wouldn't necessarily be how it would

23 be."

24    Jonathan says, "Realistically, my engineering degree is

25 basically worthless overseas."

PETER OLINITS - DIRECT EXAMINATION

1     Diana says, "You keep saying that, but I don't see the

2   evidence.  I cannot believe that the two of us wouldn't be

3   welcomed and rewarded by a foreign government."

4     Jonathan writes, "I'm not a PE, and my specialized

5   knowledge makes it hard to get anything in commercial nuclear

6   which is just as dead in Europe as here."

7     Jonathan writes again, "Let's talk when I get home."

8     Diana says, "I'm done talking about it right now.  I'm

9   getting angry."

10     On October 5, 2020, Diana writes, "I think we need to be

11   actively making plans to leave the country."

12         MS. SMOLAR:  Your Honor, this is a demonstrative

13   exhibit for purposes of today's hearing.  We can move its

14   admission if there's no objection.

15         THE COURT:  Is there an objection to the admission?

16         MR. MACMAHON:  No objection, Your Honor.

17         THE COURT:  Be so admitted.

18         MS. SMOLAR:  Admitted.

19     (Government's Exhibit No. 26 was admitted.)

20   BY MS. SMOLAR:

21   Q.  So we talked about the fact that the $100,000 in Monero has

22   not been located; correct?

23   A.  Yes.

24   Q.  All the classified documents have not yet been recovered;

25   correct?

PETER OLINITS - DIRECT EXAMINATION

1    A.   Yes.

2    Q.   And the FBI also has not yet obtained full access to the

3    ProtonMail accounts of the defendants; correct?

4    A.   That's correct.

5    Q.   And during the course of your investigation, did you

6    discover whether or not Jonathan Toebbe had a ProtonMail

7    account?

8    A.   Yes, he did.

9    Q.   And at some point in your investigation, did you learn

10   whether he had upgraded that account?

11   A.   Yes.  So in November -- so Jonathan Toebbe had a Proton

12   account since at least 2012 because he used it on his SF-86.

13   However, in 2018 -- in November of 2018, Jonathan purchased

14   what's called a Visionary Proton Plan.  It costs $479 and it's

15   a two-year plan.

16       That plan gives you access to the ability to resonate out

17   of -- of your choice of 55 countries, a VPN network as well as

18   a Tor which is The Onion Router.  So it's a way to deeply

19   encrypt and disguise any communications on ProtonMail.  It's

20   their highest level of protection that they offer.  After that

21   expired in November 2020, he renewed it for another two years

22   for $479, and I was able to see that in their joint checking

23   account.

24   Q.   And is there any -- based on your training and experience,

25   what concerns do you have about -- for example, if Mrs. Toebbe

PETER OLINITS – CROSS EXAMINATION

1  was to go home today and access the internet, what could she

2  do?

3  A.  She could further hide the $100,000 where the government

4  would not be able to find that.  She could use that money to

5  flee the country.  She could access that money from any country

6  as long as she had access to the internet.  She could alter any

7  type of electronic accounts that we're unaware of or unable to

8  get into, including ProtonMail accounts.  She could alter or

9  destroy any type of cloud-based accounts that the two of them

10 may have.

11 Q.  And did you learn during the course of your investigation

12 that there was a drop box account that has yet to be accessed

13 as well?

14 A.  Yes.  And, lastly, she could potentially sell this to other

15 buyers as was described which was already part of potentially

16 their plan.

17 Q.  And at this point in time, you don't know whether other

18 countries have been solicited by these defendants?

19 A.  Not at this time.

20          MS. SMOLAR:  No further questions, Your Honor.

21          THE COURT:  Mr. MacMahon, cross examination, sir?

22          MR. MACMAHON:  Thank you, Your Honor.

23                    CROSS EXAMINATION

24 BY MR. MACMAHON:

25 Q.  Agent, I'm sorry.  It's been a while.  I forgot your

PETER OLINITS - CROSS EXAMINATION

1  name.

2  A.  Peter Olinits.

3  Q.  How do you say that again?

4  A.  Olinits.

5  Q.  Let's try to go backwards.  These Telegram messages that

6  you just read --

7  A.  Yeah.

8  Q.  -- those are from a couple of years ago; right?

9  A.  That's correct.

10  Q.  And they all predate anything that happened in this case,

11  don't they?

12  A.  No.  So there is metadata on the original --

13  Q.  Sir, these -- what you just read to the Court predates what

14  happened in this case.  I'll ask you --

15  A.  Now --

16  Q.  -- about the metadata in a second.

17  A.  Okay.

18        MS. SMOLAR:  Objection, Your Honor.  He was trying to

19  answer the question.

20        THE COURT:  I'm going to allow him to answer the

21  question, but I think Mr. MacMahon's question was "Do they

22  predate?"  I'd like to hear the defendant -- the witness's

23  answer to that.

24  A.  So the metadata showed that the SD card that was sent to

25  COUNTRY1 on April 1, 2020, was taken around the timeframe or

PETER OLINITS - CROSS EXAMINATION

1   was put on that card around the timeframe of 2018.  So this is
2   after that.
3   BY MR. MACMAHON:
4   Q.  Okay.  Well, let's -- you know from all of your
5   surveillance of the Toebbe residence that Mrs. Toebbe was not a
6   fan of President Trump; correct?
7   A.  I suppose.
8   Q.  Yeah.  And there was talk in other documents that you saw
9   about her wanting to leave the country if Trump got reelected.
10  You saw that too, didn't you?
11  A.  Yes.
12  Q.  She's not the only liberal that's wanted to leave the
13  country over politics; right, sir?
14          MS. SMOLAR:  Objection, Your Honor.  That's not a
15  relevant question for this agent.
16          THE COURT:  It's not, but I'm going to allow him to
17  ask his questions.  I allowed you to ask your questions.  This
18  is a detention hearing so go right ahead.
19  BY MR. MACMAHON:
20  Q.  That's correct, isn't it, sir?
21  A.  Yes.
22  Q.  Now, the computer that you accessed, the Macintosh
23  computer, you've of course had a chance to look at that
24  computer, haven't you?
25  A.  Not at this time.

PETER OLINITS - CROSS EXAMINATION

1   Q.   That was Mr. Toebbe's computer, wasn't it?

2   A.   Yes.

3   Q.   Mrs. Toebbe's computer was given to her by her work.  Have

4   you seized that too?

5   A.   I believe so.

6   Q.   Okay.  And did you find any evidence on Ms. Toebbe's

7   computer at all that she drafted a single one of these notes

8   that you sat here and read in court today?

9   A.   We haven't been able to examine all the evidence at this

10  time.

11  Q.   But the Macintosh computer that you were -- you seized from

12  the residence, you're saying you haven't been able to look at;

13  correct?

14  A.   It's still an ongoing investigation.

15  Q.   Okay.  But that's the kind of computer that the notes that

16  you read here on and on in court today would have been composed

17  on, isn't that correct?

18  A.   Yes.

19  Q.   Okay.  And so you don't have any evidence sitting here

20  today that Mrs. Toebbe drafted a single one of those notes that

21  you read today in court; correct?

22  A.   Again, not at this time.

23  Q.   And you've been working on this for a while, haven't you,

24  sir?

25  A.   Yes.

PETER OLINITS - CROSS EXAMINATION

1  Q.  Okay.  Did you put wiretaps inside of their house?

2  A.  No.

3  Q.  So you don't have any -- did you put wiretaps inside of

4  their car?

5  A.  No.

6  Q.  Any listening devices at all?

7  A.  No.

8  Q.  So did you record any of the cell phone calls between

9  Mr. and Mrs. Toebbe?

10  A.  No.

11  Q.  That's part of your investigate -- you didn't do any of

12  that as part of your investigation?

13  A.  We've done quite a bit of search warrants but not any kind

14  of listening devices.

15  Q.  You didn't do anything proactive while any of the events

16  you've talked about today were happening; correct?

17  A.  We did search warrants on historical cell site data,

18  geolocational data of their phones, their email accounts,

19  things like that.

20  Q.  Right.  And the FBI can go to a judge and get permission to

21  put a listening device in somebody's car, can't they?

22  A.  Yes.

23  Q.  And you didn't do it?

24  A.  Right.

25  Q.  Right?

PETER OLINITS - CROSS EXAMINATION

1   A.  That's correct.

2   Q.  Okay.  So you don't have any recordings of what Mr. Toebbe

3   may have told Mrs. Toebbe as they drove to any of these sites;

4   correct?

5   A.  That is correct.

6   Q.  And you don't have any listening device warrants for the

7   house; you can't give me any -- you don't have any recordings

8   whatsoever of what Mr. Toebbe may have told her he was up to in

9   this timeframe; right?

10  A.  No.  But, again, in the letter, he had stated that there

11  was one person that knew about this relationship, and the only

12  person --

13  Q.  Agent, this will go a lot faster if you answer my

14  questions.  You don't have any -- you don't have any recordings

15  whatsoever of what Jonathan Toebbe told his wife he was up to

16  in the time that you were working on this case?

17  A.  Correct.

18  Q.  That's correct.  And when you read the email, you have no

19  evidence that Mrs. Toebbe ever saw that email, drafted it, or

20  had anything to do with it; correct?

21  A.  Not at this time, but we still have a lot of evidence to

22  review.

23  Q.  And when it says that there's only one person -- you don't

24  even know if that's a true statement, do you?

25  A.  What I do know is that she was there for three of the four

PETER OLINITS - CROSS EXAMINATION

1    dead drops where classified information was exchanged.

2    Q.  And, again, you don't have any idea what Mr. Toebbe told

3    her he was up to at all.  You just assumed she was a

4    conspirator in his plans; correct?

5            MS. SMOLAR:  Objection, Your Honor.  He's asked and

6    answered the same question many times already.

7            THE COURT:  Go ahead with your line of questioning.

8    I'm going to overrule your objection.

9        Go ahead, Mr. MacMahon.

10   BY MR. MACMAHON:

11   Q.  Do you need me to ask that question again?

12   A.  Yes, please.

13   Q.  Other than your suspicion, based upon your training and

14   experience, that she was present when these three dead drops

15   took place and that she had a phone on airplane mode, you don't

16   have any evidence whatsoever that she knew what Mr. Toebbe was

17   doing with any of these plans that he took with him from the

18   Navy Yard, do you?

19   A.  No -- no listening -- recorded plans.

20   Q.  No anything.  You don't have anything, do you?

21   A.  Again, we have a lot of digital evidence to review at this

22   time.

23   Q.  Did it occur to you as part of your investigation that

24   maybe Mr. Toebbe was telling her he was up to something other

25   than espionage against the United States?

PETER OLINITS - CROSS EXAMINATION

1  A.  I think that would be a difficult thing to sell but maybe.

2  Q.  But maybe.  Mrs. Toebbe never had access to any classified

3  information at all, did she?

4  A.  She did not.

5  Q.  Right.  She wasn't stealing information from the Navy Yard

6  and taking it out and bringing it home, was she?

7  A.  No.

8  Q.  Right.  You don't have any evidence she ever even went to

9  the Navy Yard or any other facility where these documents for

10 the $3 billion submarine might have come from; correct?

11 A.  Correct.

12 Q.  Never, never in her life did this woman have access to any

13 classified information whatsoever?

14 A.  She never had a clearance, no.

15 Q.  Okay.  And you don't know of any discussions that she may

16 have had with her husband about whether he stole classified

17 information from the federal government; right?

18 A.  I don't believe so.

19 Q.  Now, you testified a lot about Mrs. Toebbe and her SDRs.

20 That's a great word in counterespionage, isn't it, Agent?

21 A.  It's a tradecraft term, sir.

22 Q.  Right.  And the tradecraft in this case was not good.  It

23 was terrible, wasn't it?

24 A.  I mean they went above and beyond to disguise things in

25 different -- you know, as we saw in a Band-Aid, in gum

PETER OLINITS - CROSS EXAMINATION

1  wrappers, dressing the part for the locations they were at,

2  walking significant, you know, distances to try to -- when

3  there was areas that they could have parked a lot closer.

4  Q.  Sir, you knew what they were doing the whole time.  Its SDR

5  and tradecraft was terrible, wasn't it?  He fell right for your

6  trap and handed you all these documents in exchange for a

7  little bit of money.  That's correct, isn't it?

8  A.  I don't think it was terrible.

9  Q.  Okay.  Well, they're certainly here now, aren't they?

10  A.  Yes.

11  Q.  Okay.  And Mrs. Toebbe was never trained whatsoever in

12  anything like an SDR or tradecraft or anything like that, was

13  she?

14  A.  It said in one of the letters that "We" -- the pronoun we

15  -- "have been very careful in not to present any of the insider

16  threats."  That was a quote.

17  Q.  Right.  And you don't even know if that's true, whoever

18  wrote that; right?

19  A.  Whoever wrote it was trying to be honest with the

20  undercover operation.

21  Q.  And it says actually in the letter -- I think your own

22  counsel -- it says, "We received training on warning signs."

23  Right?  "We received training."

24      You said, "Oh, Judge, here's a place where they said we

25  again."  Right?

PETER OLINITS - CROSS EXAMINATION

1  A.  That's right.

2  Q.  You remember that?

3  A.  Yes.

4  Q.  She never received any training.  She's a school teacher.

5  A.  He had training, and he could have trained her.

6  Q.  But you don't know that that ever happened.  That's another

7  one of your suppositions in this case; right?

8  A.  We have to review more evidence.

9  Q.  And you want her detained while you review more evidence to

10  find out maybe this woman is innocent; correct?

11  A.  I would like her detained because I believe she's a flight

12  risk.

13  Q.  Okay.  Well, she doesn't even have a passport, does she?

14  A.  The passport is currently with the Department of State.

15  Q.  Sir, she doesn't have a passport; right?

16  A.  That's correct.

17  Q.  Okay.  And in your review of the evidence you seized in her

18  house, didn't you find out that the family was planning a trip

19  in early February and that's why they were getting their

20  passports renewed?

21  A.  They were planning a trip, but that still doesn't preclude

22  her from potentially leaving the country.

23  Q.  Okay.  You told the judge that she was ordering passports

24  on an expedited basis, and you wanted to suggest to the Court

25  that she was getting ready to flee the United States; right?

PETER OLINITS - CROSS EXAMINATION

1  A.  Yes.

2  Q.  But she was going on a trip in February.  Why didn't you

3  tell the judge that?  It wasn't on the list of questions, sir?

4  A.  I did know about the trip that they were potentially

5  planning.  I think it was in the spring of 2022.

6  Q.  Right.  And you don't have any information that Mrs. Toebbe

7  knows where any of this crypto-money is, how to access it, or

8  how to do anything with cryptocurrency, do you?

9  A.  At this time, no, but we did find a crypto-wallet in their

10  house.

11  Q.  Right.  Did you take fingerprints off of that?

12  A.  At this time, we have to analyze that.

13  Q.  But you didn't -- you're not going to tell the judge you

14  found her fingerprints on a crypto-wallet; right?

15  A.  I don't -- we did not at this point.

16  Q.  Okay.  You didn't find her fingerprints on any of the

17  documents or anything that was left at any of the dead drops;

18  right?

19  A.  Some of that is still being processed.

20  Q.  Oh.  They're still working on that too, sir?  You have any

21  video of her packing a sandwich with an SD card in it?

22  A.  We do not, sir.

23  Q.  Do you have any video of Mrs. Toebbe putting a Band-Aid

24  together with an SD card in it?

25  A.  No.

PETER OLINITS - CROSS EXAMINATION

1  Q.  You didn't put any cameras inside their house as part of

2  this investigation to see what they were up to?

3  A.  We did not.

4  Q.  You think Mrs. Toebbe knows the first thing about nuclear

5  submarines?

6  A.  I don't have any reason to believe she would.

7  Q.  What do you know about Mrs. Toebbe's background?  She has

8  no prior record at all; correct?

9  A.  That is correct.

10  Q.  All right.  She has a husband who has apparently been

11  running around trying to sell secrets that the FBI is chasing

12  around; correct?

13  A.  With her there.

14  Q.  Right.  With her there.  But you've already told us you

15  don't know that she knew everything that was going on; correct?

16  A.  At this time, we still have a lot to review.  We have a ton

17  of digital evidence we need to look at.

18  Q.  Well, in the affidavit that was -- the arrest warrant

19  was -- Ms. Toebbe's name is about three times in a 25-page

20  document, isn't it?

21  A.  Yes because she was at three locations.

22  Q.  Right.  But in terms of drafting things, stealing things,

23  trying to sell things, you don't have her identified as doing

24  any of that, do you?

25  A.  No.

PETER OLINITS - CROSS EXAMINATION

1   Q.  Do you know how Mr. Toebbe was able to steal these

2   documents from classified American facilities?

3   A.  The only thing I know is that he -- that the letter

4   indicated that he was taking out the information several pages

5   at a time as to avoid scrutiny by security officers.

6   Q.  Okay.  Did you go to the Navy Yard and do a

7   counterintelligence operation to see if you could catch him

8   there doing it?

9   A.  No.

10   Q.  Didn't that occur to you, sir?

11   A.  So how he was getting those documents out of the Navy is

12   yet to be determined.

13   Q.  Right.  And, again, she's never even been there, has no

14   access to any of this information; right?

15   A.  I don't believe so.

16   Q.  Right.  And she couldn't give -- whoever COUNTRY1 is, she

17   couldn't give anything to COUNTRY1 or anybody else if she got

18   out; right?

19   A.  She did not have access to classified information.

20   Q.  Right.  And she couldn't flee the United States without a

21   passport; right?

22   A.  That's incorrect.  So --

23   Q.  With an ankle monitor on?

24   A.  So I've worked other espionage cases that you may be

25   familiar with, and I know this Court is familiar with, where

PETER OLINITS - CROSS EXAMINATION

1  the defendant left the country multiple times without a
2  passport.
3  Q.  Okay.  Not after they'd been arrested and were on bond;
4  correct?
5  A.  That's correct.
6  Q.  Right.  And with an ankle monitor on which the pretrial
7  tells the judge is a very good way.  Or how about if their
8  father came and stayed with them who is a retired naval
9  officer --
10          MR. MACMAHON:  Excuse me, Your Honor.
11  BY MR. MACMAHON:
12  Q.  -- that would -- could help as well, wouldn't it?
13  A.  I just read various things about her trying to leave the
14  country, and she was at several of these drops.  So, you know,
15  I think she'll try to leave the country if she's let out.
16  Q.  But you have no proof that she ever tried to leave the
17  country and flee these charges at all; right?
18  A.  No, but she has traveled outside the country before.
19  Q.  Well, so have you, haven't you?
20  A.  I have, sir.
21  Q.  Is that evidence of a crime?
22  A.  No.
23  Q.  Is having a Signal account evidence of a crime?
24  A.  No.  It's just tradecraft behavior of espionage subjects.
25  Q.  Right.

PETER OLINITS - CROSS EXAMINATION

1   A.  It's one of many things.

2   Q.  So I have a Signal account.  Does that make me a spy too,

3   sir?

4   A.  No, sir.

5   Q.  How about a Telegram account?

6   A.  It does not.

7   Q.  But you want to tell the judge she had one; right?  Make it

8   look like she was a spy because she had a Signal account?  Is

9   that right, sir?

10  A.  No, sir.  I don't want that.

11          MR. MACMAHON:  Can I consult with counsel for a

12  second, Your Honor?

13          THE COURT:  You may, sir.

14  BY MR. MACMAHON:

15  Q.  Sir, I'm sorry.  One last thing.

16          MR. MACMAHON:  I'm sorry, Your Honor.

17  BY MR. MACMAHON:

18  Q.  There's two children in the house, aren't there?

19  A.  Yes.

20  Q.  And you know from the surveillance of the house that

21  Mrs. Toebbe loves and takes care of her children; correct?

22  A.  I do know -- I do know she's there quite a bit.

23  Q.  Right.  And she's a school teacher at a private school in

24  Annapolis?

25  A.  Yes, sir.

PETER OLINITS – REDIRECT EXAMINATION

1  Q.  You believe that her kids might need their mother at home?

2  A.  I believe that if they needed to get in touch with their

3  mother when she was committing an espionage activity with her

4  husband that she shouldn't have had her phone off that day.

5  Q.  Okay.  Sir, that's a good argument.  You don't have any

6  proof that she was committing espionage that day, do you?

7  A.  She was witness to it, and she was assisting with it.

8  Q.  She was a witness to it.  Okay.

9          MR. MACMAHON:  Thank you, Your Honor.  That's all I

10 have.

11         THE COURT:  Any redirect?

12         MS. SMOLAR:  Yes, Your Honor.

13                 REDIRECT EXAMINATION

14 BY MS. SMOLAR:

15 Q.  Special Agent, are you aware of an indictment that was

16 returned yesterday that charged Diana Toebbe with three very

17 serious federal crimes?

18 A.  Yes.

19 Q.  Espionage crimes under the Atomic Energy Act; correct?

20 A.  Yes.

21 Q.  For aiding and abetting Jonathan Toebbe at these particular

22 drops of Restricted Data; correct?

23 A.  Yes.

24 Q.  And the Toebbes have been married for 18 years; correct?

25 A.  Eighteen years.

PETER OLINITS - REDIRECT EXAMINATION

1  Q.  And during that time, Mr. Toebbe worked for the Navy;

2  correct?

3  A.  He did.

4  Q.  And the MacBook that you found as well as the cash, the

5  $11,300 in cash, as well as the latex gloves, they were all

6  found in their shared bedroom; correct?

7  A.  Shared bedroom, yes.

8  Q.  And you don't know if Mr. Toebbe provided Ms. Toebbe with

9  the passwords to the ProtonMail account, to the

10 cryptocurrency -- we don't know any of that yet, do we?

11 A.  No.

12 Q.  But we're going to find out; right?

13 A.  We will.

14 Q.  The documents that were taken from the Navy pursuant to

15 Mr. Toebbe's messages, they were taken several years ago;

16 correct?

17 A.  Yes.  At least around the 2018 -- 2018 timeframe.

18 Q.  And you learned that from looking at the metadata on the SD

19 card; correct?

20 A.  Yes.

21 Q.  That had the date of 2018?

22 A.  That was the time that information was put on the SD card.

23 Q.  Let's just talk about the passports briefly.  I know you

24 stated that you worked on a case where someone was able to

25 leave the country without a passport.  Can you explain that?

PETER OLINITS - REDIRECT EXAMINATION

1  A.  So espionage subject wanted to basically defect to Russia

2  to sell classified information.  As part of that plan that

3  individual conducted a scouting trip to ensure their safe

4  passage to and from Mexico.  And I think it was May of 2019

5  where that person was able to cross over into Mexico without a

6  passport and cross back into the United States.  Thereafter --

7  I think it was August of that month -- of that year -- she

8  kidnapped her six-year-old child and took her down to Texas

9  where they took a taxi into Mexico without a valid passport.

10  And they also had class -- she also had classified information

11  with her during that trip.

12  Q.  And isn't it possible that if there was a country that

13  wanted to obtain the 50 packets of Restricted Data from

14  Mrs. Toebbe, they could provide her with safe passage to

15  another country with or without her current passport?

16        MR. MACMAHON:  Objection to the form of the question

17  about possibility.  The government hasn't even bothered to talk

18  about what embassy was reached out to.  Whether it's a friendly

19  country or otherwise.  I think it's very speculative for the

20  agent to say what might be possible in this regard.

21        MS. SMOLAR:  Counsel just asked all kinds of

22  possibility and speculation questions.

23        THE COURT:  There's a lot of speculation and

24  possibility going on in this room right now.  Let's move along

25  with the questioning, please.

PETER OLINITS – RECROSS EXAMINATION

1   BY MS. SMOLAR:

2   Q.  The three drops that Diana Toebbe was present for and aided

3   and abetted her husband with in this case on the July 26th --

4   I'm sorry -- June 26th, July 31, and October 9th, she left her

5   children for those drops; correct?

6   A.  Yes.

7   Q.  And then finally with regard to the Signal messages that we

8   referred to, there's a discussion in here about more than one

9   plan; correct?  Plan A and Plan B?

10  A.  Correct.

11  Q.  Do any of those plans refer to President Trump?

12  A.  No.  Not that I know of.

13          MS. SMOLAR:  No further questions.

14          THE COURT:  Any recross?

15                      RECROSS EXAMINATION

16  BY MR. MACMAHON:

17  Q.  Sir, you just told us before that this isn't even all the

18  messages.  These are the ones you picked out.

19  A.  That's correct.

20  Q.  Correct.  So on the exhibit that you picked out, there's

21  nothing about Donald Trump?

22  A.  It has to do with them fleeing the country.

23  Q.  Well, that's the way you read it; right?  And there are --

24  A.  That's what it says.

25  Q.  -- other messages that deal with leaving the country

PETER OLINITS – RECROSS EXAMINATION

1    because of President Trump; right?

2    A.   I don't remember specifically but maybe.

3              MR. MACMAHON:  That's all, Your Honor.

4              THE COURT:  Any redirect?

5              MS. SMOLAR:  Nothing further, Your Honor.

6              THE COURT:  All right, sir.  Thank you.  You may step

7    down.  Thank you.

8        (Witness excused).

9

10                    (End of requested testimony.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2

3           I, Kate A. Slayden, Registered Professional Reporter

4  and Official Court Reporter of the United States District Court

5  for the Northern District of West Virginia, do hereby certify

6  that the foregoing is a true and correct transcript to the best

7  of my ability of the digitally-recorded proceedings had in the

8  above-styled action on October 20, 2021, as transcribed by me.

9           I certify that the transcript fees and format comply

10 with those prescribed by the Court and Judicial Conference of

11 the United States.

12          Given under my hand this 12th day of November, 2021.

13

14

15                         /s/Kate A. Slayden

16                         Kate A. Slayden, RPR, CCR
                           Official Reporter, United States
17                         District Court for the Northern
                           District of West Virginia
18

19

20

21

22

23

24

25